# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

AMALIA DIAZ TORRES, surviving    )
spouse of ELEAZOR TORRES GOMEZ,    )
                                       )
        **Plaintiff,**            )
                                       )
**v.**                                       )     **Case No. 08-CV-0185-CVE-TLW**
                                       )
**CINTAS CORPORATION and LAVATECH,**  )
**INC.,**                                  )
                                       )
        **Defendants.**        )

## OPINION AND ORDER

Now before the Court are Defendant Cintas Corporation's Motion for Summary Judgment (Dkt. ## 106, 109), and Defendant Lavatec, Inc.'s, Motion for Summary Judgment (Dkt. # 116). Magistrate Judge T. Lane Wilson has also filed a report and recommendation (Dkt. # 113), recommending that the Court deny Plaintiff's Motion for Leave to File Second Amended Complaint (Dkt. # 102), and plaintiff has filed a timely objection to the report and recommendation.

## I.

Cintas Corporation (Cintas) sells, leases, and rents uniforms to customers across the country and maintains a plant in Tulsa, Oklahoma. In February 1994, Cintas asked Lavatech, Inc. (Lavatech) to design and install an automated wash alley for Cintas' Tulsa plant. Cintas requested some adjustments to Lavatech's original design and approved a revised design issued by Lavatech on June 6, 1994. The final design for the automated wash alley included six washing machines connected to two dryers by a shuttle conveyor, and the dryers unloaded the clean clothes onto three unloading conveyors. This design allowed Cintas to expand the wash alley with an additional washing machine and dryer without modification to the underlying structure. Lavatech began

installation of the automated wash alley in February 1995, and completed the installation over 12 days. The installation and startup of the automated wash alley included initial training of Cintas' employees concerning use of the equipment. By the end of 1996, Cintas had purchased an additional washer and dryer for the automated wash alley, and Lavatech had fully installed the new equipment. Lavatech states that it was not responsible for monitoring the equipment or providing training to Cintas' employees after the initial installation, and Cintas retained its own maintenance staff for day-to-day repairs. Dkt. # 117, Ex. 4, at 5.

The automated wash alley was designed to fit within the layout of the Tulsa plant,[1] but there is no dispute that the design was not wholly unique to Cintas' Tulsa plant. Lavatech completed the design for the Tulsa plant using specifications for pre-existing machine models and modified designs from previous jobs. However, the layout of the Tulsa plant was different from other Cintas plants, and Lavatech had to modify its design for automated wash alleys to accommodate the available space. Dkt. # 117, Ex. 4, at 2. It is not clear if the Tulsa plant was originally built to be used as a laundry facility or was subsequently modified to meet Cintas' needs, but the foundation of the plant included a trench to permit installation of an automated wash alley. The dryers operated on natural gas, and each dryer was connected to a separate duct and vented through the roof of the plant. The washing machines, dryers, and conveyors were bolted to the floor of the plant with lead anchors, and the rail system moving laundry into the wash alley was bolted to the ceiling. Dkt. # 117, Ex. 3, at

---

[1]     Plaintiff disputes that the design of the automated wash alley was "unique" to the Tulsa plant. Dkt. # 143-2, at 6-7. However, Lavatech is not asserting that the design was unique to the Tulsa plant, and acknowledges that the equipment and layout are based on standard designs used in commercial wash alleys. Lavatech simply notes that it is undisputed that Cintas purchased an automated wash alley and Lavatech provided a plan based on the space available in the Tulsa plant. Dkt. # 117, Ex. 5, at 2-3.

2. The washing machines, dryers, and rail system were "integrated" into the plant's utilities systems.

Id.

In 2000, two Cintas employees were injured in separate incidents when they attempted to push a load of clothes into a washing machine with their legs while standing on an energized conveyor. Dkt. # 131, Ex. 4, at 1. On January 25, 2001, Cintas issued a safety bulletin to all of its plants advising employees of the proper procedure to clear a jam. Cintas found that employees were exceeding the recommended weight limitations for loads and this caused jams before loads entered the washing machines. The 2001 safety bulletin issued to all plants stating that "UNDER NO CIRCUMSTANCES should any partner work on a machine without following the proper lockout/tagout procedures. Both incidents were avoidable if the partner would have de-energized and locked-out the washer before entering the hopper." Id. at 1. The 2001 safety bulletin included two recommendations requiring the involvement of Lavatech to implement Cintas' new safety directive:

- Braun, Lavatec, and Jensen are working on adding signage to the washers, dryers and conveyors to warn about improper entry of equipment. New Braun and Lavatec washers will ship with appropriate signage. . . . Lavatec is preparing decals for their machinery at this time. . . .

- Braun and Lavatec will be writing procedures on how to safely clear hopper obstructions. The instruction/training must be provided to all partners authorized to operate wash alley, including the unloading team. Deviations from accepted operating practices of wash alley equipment must be met with swift repercussions. Any training must be documented and should be considered a written warning. A subsequent offence [sic] is grounds for immediate dismissal. A partner not following safe guidelines may not survive a second warning.

3

Id. at 2.  Lavatech sent new warning stickers to Cintas in April 2001, but it is not clear if Lavatech provided additional training to Cintas' employees or sent updated instruction manuals.  See Dkt. # 143, Ex. 6, at 3.

On April 16, 2004, a Cintas employee at a plant in Painesville, Ohio attempted to dislodge a jam on the conveyor leading into a dryer caused by an over-sized load of laundry, and he was pulled into the dryer when the clothes wrapped around his legs.  Another employee was present and turned the dryer off before any serious injury resulted from the incident.  However, this incident caused Cintas to reevaluate its safety procedures for clearing dryer jams in the automated wash alley.  Cintas issued a safety bulletin on April 30, 2004 reminding employees to shut off the power to the dryer and climb onto a conveyor only if another employee is present.  Dkt. # 131, Ex. 22.  Cintas implemented a two-tiered process for clearing jams at a dryer.  First, a wash alley operator was directed to stand on the ground and use a pole to attempt to dislodge the jam.  If this approach was unsuccessful, Cintas trained employees to follow a three step process:

> Step 1 was to turn off the power to the dryer with the E-stop on the dryer.  Step 2 was to turn off the power on the shuttle conveyor with the E-stop on the conveyor.  And step 3, then, would be to mount the conveyor and pull the garments back down to even them out on the conveyor.  And just before that could happen, there had to be a man standing by the master console to ensure some activity couldn't happen to energize the equipment.

Dkt. # 106, Ex. C, at 5.

Cintas hired Eleazor Torres in 2000 as a loader/sling operator, and his primary job was to load dirty garments into bags.  However, Torres also worked as a backup in the automated wash alley.  As an employee working in the wash alley, Torres received training concerning the proper procedure for clearing jammed clothing from the dryer door.  Steve Jordan, the second shift supervisor at the Tulsa plant, provided verbal training and a demonstration to Torres, Chuck

4

Hegdale, and Elias Olguin of the proper method to clear a dryer jam. Id. at 4. Torres translated Jordan's directions from English to Spanish for Olguin. Id. at 5. Jordan's supervisor, Tommy Cocanaugher, confirmed the following day that Jordan provided this training. Id., Ex. D, at 4. At least two Cintas employees have given deposition testimony that Cintas provided annual training to all employees about the proper procedure to clear a jam, and directed employees to follow lockout/tagout procedures before climbing on a conveyor or entering a confined space. Id., Ex. A, at 6-7; Id. Ex. D, at 3. However, plaintiff asserts that there is no documentation showing that employees were specifically trained to follow lockout/tagout procedures when clearing jams and, because Cintas claims to keep records of all training provided to its employees, plaintiff implies that the oral training and demonstration described by Jordan did not occur.

On March 6, 2007, Torres was working in the automated wash alley when a load of clothes from the conveyor jammed in the dryer door. Torres climbed onto the conveyor without turning off the power to the conveyor or the dryer, and began jumping on the clothes to dislodge the jam. The clothes slid into the dryer and Torres lost his balance, and he fell into the dryer. No other employees were present to turn off the dryer and Torres died as a result of the incident. The Occupational Safety and Health Administration (OSHA) opened an investigation into Torres' death. Randy Harris, a wash alley employee, gave a statement to OSHA that Cintas trained employees to turn off the power to the dryer, but this policy was not enforced. Dkt. # 131, Ex. 28. Harris did not directly state that his supervisor was aware that he climbed onto a conveyor without powering down the dryer, but he did tell OSHA that "everyone did it" and no disciplinary action was taken against them. Id. Cintas reviewed videotape from a surveillance camera in the automated wash alley for the period of about two weeks before Torres' death, and the video footage shows wash alley employees

repeatedly climbing on the conveyor without turning off the power to the dryer.  Jordan and Cocanougher testified in their depositions that they were unaware that employees were using improper procedures to dislodge jams in the dryer.   However, Jordan gave a statement to OSHA suggesting that he was aware at some point that employees were climbing on energized conveyors to clear jams, but this practice stopped after Cintas provided additional training to its employees. Dkt. # 220, Ex. B, at 6-7.  About two weeks after Torres' death, a Lavatech employee, Ralph Krohne, sent an internal e-mail to another Lavatech employee describing an incident shortly before Torres' death when he visited Cintas' Tulsa plant and observed a wash alley employee climb on an energized conveyor in the presence of the plant's mechanical engineer, Jim Williams.  Dkt. # 143, Ex. 9.  Williams told Krohne that the employee had been advised to turn off the power before climbing on the conveyor but "insisted" on clearing the jam his own way.  Id.  Plaintiff has also produced affidavits from former Cintas employees Justin Wallace, Giao Le, and Lane Stewart, and each person states that he climbed onto the conveyor without turning off the power to the dryer or the conveyor, and this was the accepted practice at Cintas plants across the country.

## II.

The magistrate judge recommended denial of plaintiff's motion to file an amended complaint on the grounds of untimeliness and undue prejudice, and plaintiff has filed an objection to the report and recommendation.  Plaintiff claims that she did not learn of evidence giving rise to new claims against Lavatech until Erik Devuyst's deposition in February 2008, and she could not file a motion to amend until she had completed additional discovery to confirm Devuyst's testimony that Lavatech had a role in training employees at plants where its machinery was installed.  Dkt. # 129, at 3-5. Plaintiff's initial motion to amend was filed on April 21, 2009, and the Court agrees with the

magistrate judge that the amended motion should be treated as if filed on April 21, 2009.  See Dkt. # 113, at 1 n.1.

Plaintiff asserts that she had no basis to assert claims against Lavatech for an alleged failure to train or failure to perform a hazard analysis until she took Devuyst's deposition, because she claims that depositions of other Lavatech employees did not give her notice that she might have additional claims against Lavatech.  On October 30, 2008, plaintiff took Krohne's deposition and he testified that Lavatech did not assume a continuing obligation to supervise or train Cintas' employees after the automated wash alley was installed.  Dkt. # 129, Ex. A, at 2.  Mark Thrasher, Service Manager for Lavatech, gave deposition testimony on January 15, 2009, that he was not aware of any hazard analysis conducted for the machinery installed at Cintas' Tulsa plant.[2]  Dkt. # 102, Ex. 3, at 8.  Eric Mueller, the Director of Engineering at Lavatech, also testified that he was unaware of hazard analysis performed on the subject equipment.  Id., Ex. 5, at 2.  Plaintiff claims that David Gates, the Lavatech employee responsible for installing the equipment at the Tulsa plant, testified that Devuyst was more knowledgeable about safety warnings in Lavatech's manuals, and she wanted to wait until Devuyst's deposition to determine whether to seek leave to file an amended complaint.  Id., Ex. 2, at 3.  She argues that the proposed amended complaint is "merely an extension and more detailed explanation of the product manufacturer duties alleged in the original Petition."

---

[2]      He also testified that he did not work for Lavatech in 1994, and could not say whether any hazard analysis occurred before his employment began.  Id. at 8.

Dkt. # 102, at 2.  Plaintiff also argues that she could not have filed a motion to amend until Lavatech responded to her requests to produce materials used by Devuyst in his training seminars.[3]

The magistrate judge found that plaintiff's motion to amend was untimely and that defendant would be prejudiced by plaintiff's belated attempt to amend her complaint to assert claims concerning matters well beyond the scope of the original complaint.  Assuming that Devuyst's deposition provided new information, he found that plaintiff waited over two months before filing a motion to amend and that plaintiff failed to request an extension of the deadline to amend pleadings, even though plaintiff filed an "emergency" motion on January 30, 2009 to extend the deadline to file her expert reports.  Dkt. # 113, at 3-6.  Plaintiff objects the magistrate judge's report and recommendation.  Pursuant to Fed. R. Civ. P. 72(b), plaintiff has filed a timely objection to the magistrate judge's report and recommendation and the Court must conduct a de novo review of the magistrate judge's report and recommendation.  Under 28 U.S.C. § 636(b)(1), the court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  See also Northington v. Marin, 102 F.3d 1564, 1570 (10th Cir. 1996) ("De novo review is required after a party makes timely written objections to a magistrate's report.  The district court must consider the actual testimony or other evidence in the record and not merely review the magistrate's report and recommendations.").  The Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).

---

[3]     The magistrate judge noted that plaintiff received responses to her discovery requests for Devuyst's training materials on April 22, 2009, one day after she filed her motion to amend. Dkt. # 113, at 4 n.3.  Plaintiff did not rely on this evidence when originally seeking leave to amend, and the Court finds that the magistrate judge properly refused to consider this evidence when ruling on plaintiff's motion to amend.

Rule 15(a) provides that "leave [to amend] shall be freely given when justice so requires." Minter v. Prime Equipment Co., 451 F.3d 1196, 1204 (10th Cir. 2006); Bradley v. Val-Mejias, 379 F.3d 892, 900 (10th Cir. 2004).  "In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance . . . the leave sought should, as the rules require, be 'freely given'" Foman v. Davis, 371 U.S. 178, 182 (1962).  When considering delay as the basis to deny a motion to amend, a court must consider the length of the delay and the reason for the delay to determine if the moving party's actions constitute "undue" delay.  Smith v. Aztec Well Servicing Co., 462 F.3d 1274, 1285 (10th Cir. 2006). A court may deny leave to amend "when the party filing the motion has no adequate explanation for the delay."  Minter, 451 F.3d at 1206 (quoting Frank v. U.S. West, 3 F.3d 1357, 1365-66 (10th Cir. 1993)).

The Court has independently reviewed plaintiff's motion to amend, and finds that it is untimely.  Plaintiff learned as early as January 15, 2009 that Lavatech may not have conducted any hazard analysis on the wash alley machinery and Devuyst confirmed this at his deposition on February 24, 2009.  Thrasher, Gates, or Devuyst did not provide any new information about the warning contained on the product or in the product manual, and it is unclear how plaintiff can rely on their deposition testimony to explain her delay in filing her motion to amend. Plaintiff also argues that her proposed amended complaint is based, in part, on contradictory deposition testimony of two Lavatech employees that suggested Lavatech may have an obligation to train employees at Cintas

9

plants.[4]  Plaintiff took Kronhe's deposition on October 30, 2008, and plaintiff claims that Krohne

clearly testified that Lavatech had no role in training Cintas' employees about the proper safety

procedures.  Plaintiff took Devuyst's deposition on February 24, 2009, and Devuyst testified that

his job duties sometimes included training of employees at Cintas plants.  Plaintiff argues that

Devuyst's contradiction of Krohne's deposition testimony first alerted plaintiff that she may have

a claim based on an alleged failure to train against Cintas.  The Court has reviewed the deposition

testimony cited by plaintiff and can find no contradiction.  From Krohne's testimony, it appears he

performed maintenance work on machinery installed at a customer's plant, and it is not clear that

he would have any knowledge about Lavatech's policy concerning the training of a customer's

employees on Lavatech's equipment.  See Dkt. # 129, Ex. A, at 2.  The Court finds no contradiction

between Krohne's and Devuyst's deposition testimony, and plaintiff may not rely on the alleged

contradiction to show that her motion to amend is timely.  Even assuming that Krohne's testimony

did suggest that Lavatech took no responsibility for training Cintas' employees, this did not

terminate plaintiff's obligation to conduct timely discovery into this matter and plaintiff could have

investigated this matter well before Devuyst's deposition on February 24, 2009.

The Court also finds that granting plaintiff's motion to amend would prejudice Lavatech.

Plaintiff's original complaint put Lavatech on notice that plaintiff was alleging claims of defective

manufacture or design and failure to "inspect, service, monitor and service [sic] machinery."  Dkt.

# 2-2.  These claims are based on the theory that Lavatech sold a defective product that was

---

[4]     This argument was not raised before the magistrate judge and the Court has no obligation
to consider this argument when reviewing the report and recommendation.  In any event, the
Court finds that it lacks merit and does not provide any support for plaintiff's argument that
she could not have filed a more timely motion to amend.

dangerous to the ordinary user, or that Lavatech had an obligation to inspect, service and/or monitor the equipment and failed to do so. The proposed amended complaint alleges that Lavatech negligently failed to "inspect, service, [and] monitor machinery" and Lavatech is strictly liable and/or negligent for (1) selling a defectively designed product; (2) failing to provide adequate safety training or written instructions; (3) failing to perform a hazard analysis; (4) failing to warn users of reasonably foreseeable dangers; (5) negligently performing its assumed obligation of continued oversight or training of Cintas' employees. Dkt. # 102, Ex. 1. The claims in the original complaint generally allege that Lavatech sold a defective product or failed to maintain and service the product after installation. The proposed amended complaint alleges wholly new claims based on theories that go well beyond mere "extension" or "explanation" of plaintiff's product defect claims, and defendant would be entitled to conduct extensive discovery on these claims before proceeding to trial. However, plaintiff's claim that Lavatech failed to provide adequate warnings to Cintas' employees is simply another way to prove a manufacturer's products liability claim and this was part of the original complaint; plaintiff may proceed with a products liability or negligence claim based on defective warning theory without amending her complaint.

### III.

Defendants seek summary judgment on plaintiff's claims. Cintas asserts that plaintiff has no evidence that it intentionally injured Torres or knew with substantial certainty that Torres would be injured. Lavatech argues that plaintiff's claims based on a design defect are barred by Oklahoma's ten year statute of repose for design, planning, supervision, or construction of an improvement to real property and, even if the statute of repose does not apply, plaintiff cannot show that the warnings provided by Lavatech were defective.

11

**A.**

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## B.

Cintas argues that it is entitled to summary judgment on plaintiff's <u>Parret</u> claim because there is no evidence that Cintas intended to harm Torres or knew with substantial certainty that its conduct would injure him.   Plaintiff responds that Cintas was aware of dangerous conditions in the automated wash alley and knew that employees were climbing onto conveyors without powering down the equipment, and there are genuine issues of material fact as to whether Cintas intentionally failed to eliminate a hazard, train its employees, or post adequate safety warnings.

Cintas was Torres' employer and ordinarily the exclusive remedy for a workplace injury suffered by an employee is workers' compensation.   OKLA. STAT. tit. 85, § 12; <u>Sizemore v. Continental Cas. Co.</u>, 142 P.3d 47, 52 (Okla. 2006); <u>Davis v. CMS Continental Natural Gas, Inc.</u>, 23 P.3d 288, 292 (Okla. 2001).   However, the Oklahoma Workers' Compensation Act provides the exclusive remedy for <u>accidental</u> workplace injuries, and an injured employee may still be able to bring a tort claim against his employer for injuries caused by an employer's intentional conduct. <u>Roberts v. Barclay</u>, 369 P.2d 808 (Okla. 1962).   In <u>Parret v. Unicco Service Co.</u>, 127 P.3d 572 (Okla. 2005), the Oklahoma Supreme Court adopted the substantial certainty standard to determine if an employer's conduct constitutes an intentional act falling outside of the exclusive remedy provision of the workers' compensation act and held that:

> [i]n order for an employer's conduct to amount to an intentional tort, the employer must have (1) desired to bring about the worker's injury or (2) acted with knowledge that such injury was substantially certain to result from the employer's conduct. Under the second part of this standard, the employer must have intended the act that caused the injury with knowledge that the injury was substantially certain to follow. The issue is not merely whether the injury was substantially certain to occur, but whether the employer knew it was substantially certain to occur.   The employer's subjective appreciation of the substantial certainty of injury must be demonstrated.

Id. at 579.  It is not sufficient that the employer had knowledge of a risk of injury to its employees, but the evidence must establish that the employer acted or failed to act with actual knowledge of a substantial certainty that its employees would be injured.  Id.

Plaintiff's claims are not based on evidence that Cintas intentionally committed an act with the purpose of injuring Torres but, instead, plaintiff argues that Cintas failed to properly supervise, train, or take adequate safety precautions and Cintas knew with substantial certainty that its acts or omissions would result in injury to its employees.  Plaintiff claims that Cintas knew that oversized loads were causing jams in the washing machines and dryers, and two employees were injured in 2000 when they climbed on a conveyor to dislodge jams in a washing machine.  Dkt. # 131, at 6. Even though Cintas issued a safety bulletin suggesting the adoption of load weight limits, additional warnings on machines, and revised written procedures for clearing jams, see id., Ex. 14, plaintiff claims that Cintas failed to implement any of these procedures and failed to provide its employees any additional training.  In 2004, a Cintas employee at a plant in Painesville, Ohio was pulled into a dryer while attempting to dislodge a jam, but another employee was present and turned off the dryer before the employee suffered more serious injuries.  Cintas issued a safety bulletin stating that the incident "could have resulted in serious injury and possible death," and issued revised safety procedures for clearing jams in Lavatech equipment.  Id., Ex. 22.  Plaintiff claims that Cintas has not produced any evidence that it trained the employees at the Tulsa plant to follow the recommended safety procedures or that Cintas posted any written procedures for clearing jams. Plaintiff cites the affidavits of former Cintas employees from the Tulsa plant and other locations stating that they were told not to power down the dryer or conveyor to clear jams, and that supervisors were allegedly aware that wash alley employees climbed on energized conveyors to

14

clear jams. Id., Exs. 29, 30, 33, 51. Plaintiff claims that Cintas purposefully understaffed the wash alley in disregard of its safety procedures and knew that this could result in injury to its employees. Dkt. # 131, at 14. Plaintiff also claims that Cintas failed to monitor the wash alley employees or train them to follow alleged safety procedures requiring employees to turn off equipment when clearing jams, and implies that Cintas placed efficiency and economic gain over employee safety. Id. at 16, 31.

Cintas has produced evidence refuting many of plaintiff's claims and has shown that Torres was specifically trained to turn off the dryer before climbing onto the conveyor. Torres' direct supervisor, Steve Jordan, provided verbal instruction and a demonstration of the proper procedure to clear a jam, and he trained Torres that to turn off the power before mounting the conveyor to clear a jam. Dkt. # 110, Ex. C, at 4-5. Cocanougher spoke with Jordan the following day and verified that the training occurred. Id., Ex. D, at 4. Torres' co-workers Hegdale and Olguin confirmed that they received training on the proper procedure to clear a jam. Id., Ex. G, at 2 (Hegdale recalls receiving training and signing a form documenting that the training occurred); Id., Ex. I (Olguin testifies that "a lot" of meetings concerning safety procedures for clearing jams occurred before Torres' death). Hegdale testified that he was present when Torres received this training, but Torres repeatedly disregarded these safety procedures and climbed on the conveyor with the conveyor and dryer energized. Id., Ex. G, at 3. Hegdale claims that Torres and other employees violated safety procedures and intentionally hid their conduct from management and, even though Hegdale believed it was unsafe to climb on an energized conveyor, he did not alert management of Torres' conduct to avoid getting Torres in trouble. Id. at 6-7.

15

Plaintiff claims that it is hotly contested whether this training occurred, because Cintas employees regularly disregarded the alleged training and there is no written record that the training actually took place. At the summary judgment stage, plaintiff cannot simply claim that an issue is "hotly contested;" she has a burden to produce evidence raising a genuine issue of material fact. The evidence shows that Jordan provided oral training and demonstration to Torres, and Torres was advised by Jordan not to climb on an energized conveyor. The fact that employees disregarded the training may show that safety policies were not enforced, but plaintiff has not produced any evidence suggesting that the oral training never took place. Plaintiff may attempt to show that the training was routinely disregarded and management was aware of this disregard, but the evidence does not support an inference that Cintas failed to train its employees to turn off the power before attempting to dislodge a jam.

Cintas asserts that the evidence shows it was unaware that employees were violating safety procedures, and it had no knowledge that employees climbed onto energized conveyors to remove jams. Hegdale testified that Torres intentionally hid his non-compliance with safety procedures from management. Id. at 6-7. Cocanougher states that Hegdale did not report any safety violations by Torres, even though Cintas requires its employees to report unsafe conduct and an employee can be reprimanded for failing to report safety violations. Id., Ex. D, at 12. Harris testified that he also climbed on the conveyor in violation of his training, and he did this when management was not present to avoid being reprimanded. Id., Ex. F, at 9. Harris also gave a statement to OSHA claiming that he knew the proper safety procedures, but they were not enforced by management. Dkt. # 131, Ex. 28. Jordan testified during his deposition that he did not recall seeing anyone climb onto a conveyor with the power on between 2002 and 2007. Dkt. # 110, Ex. C, at 2.

16

Plaintiff asserts that Jordan was in the wash alley three to four times per hour during his shift, and implies that he was actually aware that wash alley employees were climbing on energized conveyors. In the same deposition testimony cited by plaintiff, Jordan clearly refutes plaintiff's implication that he was aware of the manner in which wash alley employees cleared jams, and he denied seeing Torres or any other employee on an energized conveyor.[5] Dkt. # 131, Ex. 36, at 7. However, plaintiff has produced video from surveillance cameras showing numerous employees climbing the conveyor and jumping on clothing stuck in the dryer door. Dkt. # 131, Ex. 5. She has also produced an internal e-mail sent by a Lavatech employee showing that the mechanical engineer for Cintas' Tulsa plant observed an employee climbing on an energized conveyor and this was not the first time this had occurred in his presence. Dkt. # 143, Ex. 9. Construing the evidence in favor of plaintiff, the Court finds that there is a genuine issue of fact as to whether management was aware that Cintas employees climbed on energized conveyors in violation of Cintas' safety procedures and whether Cintas' safety policies were enforced by management.

---

[5]     Plaintiff also claims that Jordan's OSHA statement contradicts his deposition testimony that he was unaware that employees climbed on energized conveyors. Dkt. # 220, at 3-4. Plaintiff is correct that there is a slight contradiction between Jordan's OSHA statement and his deposition testimony. Jordan testified in his deposition that he was not aware of employees climbing on an energized conveyor. In his OSHA statement, Jordan claims that he saw employees violating safety procedures before he provided training in 2005, and he subsequently reprimanded employees for failing to turn off the power before clearing a jam. Dkt. # 220, Ex. B, at 6-7. In his deposition, Jordan testified that he had not seen an employee on an "energized conveyor" between 2002 and 2007. Id., Ex. F, at 2. Construing the evidence in plaintiff's favor, the Court will infer for purposes of Cintas' motion for summary judgment that Jordan observed Cintas employees on a conveyor before 2005, but there is no direct evidence that Jordan observed an employee on an energized conveyor after the oral training in 2005.

Plaintiff has produced a statement given to OSHA by Randy Harris, a wash alley employee during the relevant time period, and claims that Harris' statement provides direct evidence that management failed to enforce certain safety procedures.  In the statement, Harris claims that:

> [Ronald] Jordan is the leader on the 3rd shift.  He's the one in charge.  Before the accident I did get on the conveyor and I didn't shut it off.  I would hold onto the top of the dryer and push it in with  my knee.  I'm sure he's seen me on the conveyor (Jordan) but there was never disciplinary action.  Everyone did it.

Dkt. # 131, Ex. 28, at 1.  Harris signed the statement on March 27, 2007.  However, Harris claims that he did not write the statement, and he merely signed the statement without reading it after it was prepared by an OSHA employee.  Dkt. # 136, Ex. E, at 6-7.  Like other evidence in the summary judgment record, the Court will accept the evidence at face value and reserve judgment on the admissibility of this evidence at trial.   Harris' OSHA statement supports an inference that management at the Tulsa plant may have been aware that Harris climbed on an energized conveyor and that other wash alley employees climbed onto energized conveyors to clear jams with the knowledge of management.

Plaintiff claims that Cintas trained its employees not to turn off the power to the conveyor and dryer before attempting to clear a jam, and relies on affidavits submitted by former Cintas employees.  However, the affidavits do not reflect Cintas' practice at or near the time of Torres' accident, because the employees relied upon by plaintiff were no longer working at Cintas during the relevant time period.  Justin Wallace submitted an affidavit stating that he would walk onto conveyors without powering down the equipment, but Wallace stopped working at Cintas in January 2005 and has no personal knowledge of Cintas' procedures after he left.  Dkt. # 136, Ex. N, at 2.  Giao Le states he was not reprimanded for standing on a conveyor with the power on when clearing jams, but he worked at the Tulsa plant from 2000 to 2004 and does not offer any information about

Cintas' training after that time.  Dkt. # 131, Ex. 33.  Lane Stewart worked at a Cintas plant in Mobile, Alabama, and provides no information about the procedures used at Cintas' Tulsa plant. Id., Ex. 30.  The Court will consider this evidence to the extent that it tends to show that Cintas had a historical practice of allowing its employees to climb on energized conveyors or that Cintas failed to enforce certain safety policies.  However, this evidence does not refute Steve Jordan's testimony that he trained Torres to turn off the power before climbing on a conveyor and it does not show that Cintas' managers allowed employees to climb on an energized conveyor anytime near March 2007.

The Court finds that plaintiff has produced sufficient evidence to raise a genuine issue of material fact that precludes summary judgment as to her Parret claim.  There is conflicting evidence about whether Cintas' managers knew that employees were climbing on energized conveyors.  The videotape evidence shows employees routinely disregarding Cintas' safety procedures and, in fact, does not ever show an employee turning off the conveyor or dryer before clearing a jam.  The plant mechanical engineer was aware that employees climbed on energized conveyors and this suggests that other managers may have been aware of this practice as well.  Combined with the undisputed fact that the managers of Cintas' Tulsa plant were aware of prior accidents occurring at other Cintas plants, this suggests that the managers were also aware a similar injury could occur at the Tulsa plant.  This raises a genuine issue of material fact as to whether Cintas' managers knew with substantial certainty that Torres could be injured by climbing on an energized conveyor and failed to take steps to stop this practice.  At trial, plaintiff must demonstrate that Cintas knew with substantial certainty that Torres could be injured and it is not enough to show that Cintas acted negligently.  See Armstrong v. Carr, 77 P.3d 598, 603 (Okla. Civ. App. 2003) (claims based on alleged failure to train or supervise were negligence claims and could not be used to circumvent

exclusive remedy provision of the Oklahoma Workers' Compensation Act).  However, the summary judgment record contains conflicting evidence as to Cintas' knowledge of its employees' practices and its appreciation of the risk to its employees, and summary judgment is not appropriate on plaintiff's <u>Parret</u> claim.

**C.**

Lavatech argues that plaintiff's design defect claims are barred by the statute of repose, because the automated wash alley is an improvement to real property and her claim was not filed within 10 years of installation of the wash alley.  Plaintiff responds that the automated wash alley is not treated as part of the real property, and she may proceed with her claims based on alleged design defects.  She also claims that the has sufficient evidence to raise a genuine issue of material fact that Lavatech's warnings were inadequate, and she has a viable claim for manufacturer's products liability under a failure to warn theory.

OKLA. STAT. tit. 12, § 109 provides:

No action in tort to recover damages

(i) for any deficiency in the design, planning, supervision or observation of construction or construction of an improvement to real property,

(ii) for injury to property, real or personal, arising out of any such deficiency, or

(iii) for injury to the person or for wrongful death arising out of any such deficiency,

shall be brought against any person owning, leasing, or in possession of such improvement or performing or furnishing the design, planning, supervision or observation of construction or construction of such an improvement more than ten (10) years after substantial completion of such an improvement.

The statute does not define "improvement to real property," but the Oklahoma Supreme Court has provided guidance on how to determine if machinery constitutes an improvement to real property. The first inquiry is whether the property is subject to ad valorem taxes or is treated as personal property for tax purposes. Durham v. Herbert Olbrich GMBH & Co., 404 F.3d 1249, 1252 (10th Cir. 2005); Smith v. Westinghouse Elec. Corp., 732 P.2d 466, 470 (Okla. 1987). If property is treated as personal property instead of part of the real property, this weighs heavily against the treatment of an item as an improvement to real property under § 109. Durham, 404 F.3d at 1253. The definition of real property under Oklahoma law includes "the land itself" and "all buildings, structures and improvements or other fixtures" that are not treated as personal property. Kirby v. Jean's Plumbing Heat & Air, ___ P.3d ___, 2009 WL 3003924 (Okla. Sept. 22, 2009). The tax treatment of property is not dispositive as to whether something is treated as an improvement to real property. The ownership status and location of the property is also a significant factor. If the property is owned by the same entity that owns the real property, this suggests that the property may be an improvement to real property. Durham, 404 F.3d at 1256. Finally, a court should consider "(1) the permanence of the improvement (2) the degree to which the improvement enhances the value of the realty; and (3) the intention of the parties to make the improvement one to the realty." Id. at 1253.

Lavatech suggests that the tax status of the machinery is not relevant or given minimal weight when the machinery is located on the subject real property and the real property is owned by someone other than the manufacturer. Dkt. # 211, at 5. However, the Tenth Circuit expressly rejected this argument in Durham and found that the status of machinery as real or personal property is a significant factor regardless of who owns the machinery. Durham, 404 F.3d at 1253. It is

undisputed that Cintas treats the wash alley equipment as personal property. Dkt. # 143-2, at 13; Dkt. # 211, at 1. It is also undisputed that Cintas owns the wash alley equipment and the equipment is located at Cintas' Tulsa plant, and Lavatech is correct that the tax status of the equipment does not end the Court's inquiry into the applicability of § 109 in such cases. Unlike <u>Smith</u>, the machinery causing the decedent's injury is located on the real property where the accident occurred, and this suggests that the automated wash alley may be an improvement to real property under § 109. <u>See</u> <u>Smith</u>, 732 P.2d at 469. Even though the automated wash alley is taxed as personal property, the Tenth Circuit has rejected plaintiff's argument that this precludes consideration of the other factors, and the Court will consider the remaining factors. <u>See</u> <u>Durham</u>, 404 F.3d at 1256.

Lavatech argues that the automated wash alley is a permanent addition to the real property. Plaintiff responds that the automated wash alley is not anchored to the real property in a permanent manner, because it is merely bolted to the real property and connected to the real property's pre-existing utilities systems. Lavatech has provided the affidavit of David Gates, a service representative for Lavatech who participated in the installation of the automated wash alley at the Tulsa Plant. Gates states that the automated wash alley is held in place by concrete anchors, and the machinery is bolted to the anchors. Dkt. # 117, Ex. 2, at 2. He further states that the machinery is "integrated" into the Tulsa plant's "electrical, gas, water, reuse water, steam, compressed air, ventilation and plumbing services/utilities via conduit, piping, fittings and structural supports. <u>Id.</u> Lavatech also points out the real property's foundation contains a trench to accommodate the installation of the automated wash alley. Plaintiff argues that bolting the equipment to the floor and plugging machinery into utilities systems is not evidence that automated wash alley was intended to be permanent. However, Lavatach has shown that the automated wash alley is distinguishable

in some ways from the equipment at issue in <u>Durham</u>, and it is more permanent in nature than the base coating production line discussed in <u>Durham</u>.  The base coating production line was freestanding and not welded to the floor, and the owner of the real property mandated that "no equipment may be connected to the building structure." <u>Durham</u>, 404 F.3d at 1256.  The automated wash alley is anchored and bolted to the floor over a concrete trench designed to accommodate such equipment, and the equipment is also vented through the ceiling.  The installation of the automated wash alley took almost twelve days and required a substantial amount of labor to connect the machinery into the building's utilities systems.  Even though Cintas treats the property as personal property, the Court finds that the automated wash alley is permanent feature of the real property.

The next factor is the degree to which the automated wash alley enhances the value of the real property.  Lavatech asserts that the real property was intended to serve as a laundry facility and would lose value if the equipment were removed.  Dkt. # 117, at 21.  Plaintiff responds that "the machines can be removed or replaced without any effect on their usefulness or the usefulness of the facility itself." Dkt. # 143-2, at 21.  However, plaintiff offers no evidence to support this assertion.  Lavatech has produced evidence that the foundation of the Tulsa plant contains a trench specifically for an automated wash alley.  This is an important distinction from <u>Durham</u>.  The Tenth Circuit noted that the base coating production line could be removed without harm to the real property and the property could be used an industrial building once the machinery was removed.  <u>Durham</u>, 404 F.3d at 1256.  In this case, Cintas operated a laundry facility and modified the foundation of the building to accommodate its specialized needs.  Thus, it is not clear that the building would be useful as ordinary industrial space without further modification and the real property could lose value if the automated wash alley were removed.  This suggests that presence of the automated wash alley

enhances the value of the real property for its intended use as a laundry facility.  See Goad v. The Buschman Co., 316 Fed. Appx. 813, 817 (10th Cir. Mar. 19, 2009) ("[t]he relevant focus is whether the system "add[s] to the value of the realty, for the purposes for which it was intended to be used").[6]

Finally, the Court must consider whether Cintas intended the automated wash alley to be an improvement to the real property.  Lavatech argues that it designed an automated wash alley for installation at Cintas' Tulsa plant, but plaintiff is correct that Lavatech did not develop a completely unique design or machinery for Cintas.  In Durham, the Tenth Circuit looked for evidence that the parties intended the machinery to become a permanent feature of the real property and specifically considered evidence suggesting that the machinery could be moved without harm to the real property as evidence that the parties did not intend for the machinery to be treated as an improvement to the real property.  Durham, 404 F.3d 1256-57.  In this case, there is no evidence that Cintas has ever disassembled or moved an entire wash alley, but there is also no evidence that Cintas has attempted to move an entire wash alley.  See Dkt. # 117, Ex. 2, at 10 (plaintiff's expert Glen P. Phillips testified that he had no personal knowledge of Cintas moving or attempting to move a complete wash alley).  However, Lavatech has produced evidence showing that the procedures to install the automated wash alley involved greater integration into the real property than installation of the base coat production line in Durham.  Plaintiff attempts to downplay this evidence but has not offered any evidence to contradict Lavatech's description of the installation process.  While the Court does not have conclusive evidence that a wash alley could never be moved without harm to the machinery or the real property, the Court finds that Lavatech has produced evidence that a complete uninstallation has not been attempted and has shown that uninstallation would require

---

[6]    Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1: 10th Cir. R. 32.1.

more than merely unbolting the equipment from the real property.  Considering the presence of a trench in the foundation of the building to accommodate installation of the automated wash alley and the fact that a complete uninstallation has never been attempted, the Court finds that Lavatech has produced evidence that Cintas intended the automated wash alley to be a permanent improvement to the real property.

The Tenth Circuit noted that <u>Durham</u> was a "close case" but that the defendant there had not produced sufficient evidence to overcome the significant fact that the equipment was treated as personal property by the owner.  <u>Durham</u>, 404 F.3d at 1257.  This case is similar to <u>Durham</u> in that the automated wash alley is taxed as personal property but is owned by someone other than the manufacturer.  However, there are some factors that distinguish this case from <u>Durham</u>, and the Court must decide if these differences are sufficient to treat the automated wash alley as an improvement to real property.  In <u>Durham</u>, the machinery was simply bolted to the floor and there was evidence that the owner of the real property did not intend for any permanent additions to the real property.  In this case, the automated wash alley is bolted to the floor and the ceiling in a more permanent manner, and Cintas modified the foundation with a trench to specifically accommodate the installation of the automated wash alley.  There is no evidence that an automated wash alley has ever been disassembled and moved once it has been  installed.  While plaintiff has shown that Cintas replaced individual washers and dryers without harm to the real property, this evidence standing alone is not sufficient to show that an entire automated wash alley could be disassembled without harm to the real property or diminishment of the value of the real property.  These additional factors distinguish this case from <u>Durham</u>, and the Court finds that the automated wash alley is an improvement to real property.

Based on this finding, plaintiff's design defect claims against Lavatech are barred by the statute of repose.  The installation of the automated wash alley was completed in 1995, and plaintiff's claims did not arise until 2007.  Therefore, her design defect claims against Lavatech occurred after the ten year statute of repose and are barred by § 109.  See St. Paul Fire & Marine Ins. Co. v. Getty Oil Co., 782 P.2d 915 (Okla. 1989) (claims arising out of the design, planning or construction of an improvement to real property are barred if brought more than ten years after "substantial completion" of the improvement).  Although plaintiff does not address the applicability of § 109 to Lavatech, the Court also finds that Lavatech qualifies as a person "performing or furnishing the design, planning, supervision or observation of construction or construction of such an improvement . . . ."  Section 109 does not protect the "broad spectrum of manufacturers," but it does bar design defect claims against "manufacturers who also perform the task of constructing what becomes an improvement to real property."  Durham, 404 F.3d at 1254-55.  Lavatech did not simply deliver pre-fabricated products to Cintas but, instead, it designed the automated wash alley for the Tulsa plant, installed the equipment, and provided initial training to Cintas' employees over a twelve day period.  This goes well beyond the act of manufacturing the component parts of the automated wash alley, and Lavatech is entitled to the protection of § 109.

Plaintiff argues that many of her claims are not barred by the statute of repose, because her claims are not based solely on a design defect theory.  However, plaintiff's motion to amend her complaint is denied, and many of the claims she cites were not plead in her complaint.  Plaintiff's complaint does not allege any claims based on an alleged failure to train or supervise Cintas' employees, provide an adequate instruction manual, or conduct a hazard or task analysis, and the Court declines to offer an advisory opinion about whether Lavatech is entitled to summary judgment

on such claims.  Plaintiff had ample time to conduct discovery on such theories and file an amended complaint, but waited until discovery was nearly completed before filing a motion to amend. Plaintiff may proceed on the theories alleged in her complaint to the extent that her claims are not barred by the statute of repose.  Plaintiff's manufacturer's products liability claim is clearly barred by the statute of repose, but she has also alleged a negligence claim against Lavatech for "failure to inspect, service, monitor and service [sic]  machinery."  Dkt. # 7, at 28.  Due to the unique circumstances of this case, the Court finds that this reasonably includes a negligence claim based on a failure to provide adequate warnings, because plaintiff has produced evidence that Lavatech sent new warnings to Cintas in 2001 and the warnings at issue were not included on the original machinery.  If plaintiff were contesting the adequacy of the original warnings, this type of claim would be barred by the statute of repose, because a failure to warn claim is generally just another way to prove that a product is defective.  The warnings at issue were sent by Lavatech to Cintas in 2001 and did not come with the original machine.[7]  Plaintiff argues that this post-installation duty does not concern the design or construction of the automated wash alley, but constitute a post-installation alteration to the automated wash alley.  The Court finds that plaintiff's manufacturer's products liability and negligence claims based on a warning sticker provided in 2001 are reasonably within the scope of the claims alleged in the complaint and are not barred by the statute of repose, and she may proceed with claims against Lavatech based on warning stickers added to the machines following completion of the initial installation.  If the 2001 warning stickers were different from the original warnings, this would be a material alteration to the automated wash alley for purposes of

---

[7]     Lavatech argues that plaintiff has not provided evidence that the 2001 warning stickers differed from the original warnings.  However, Lavatech does not provide evidence that the warnings were the same, and the Court cannot rely Lavatech's statement in a reply brief as a basis to grant summary judgment.

a design defect claim, and this type of claim is not based on the original design or installation of the automated wash alley.

Whether plaintiff is proceeding under a negligence or manufacturer's products liability theory, the law concerning the adequacy of a product warning is similar.  See Grover v. Superior Welding, Inc., 893 P.2d 500 (Okla. 1995); Berry v. Eckhardt Porshe Audi, Inc., 578 P.2d 1195, 1196 (Okla. 1978).  A product may be defective due to defective design or manufacture, but a product may also be defective if a manufacturer fails to provide the user adequate warning of inherent dangers from all foreseeable uses of a product.  Prince v. B.F. Ascher Co., Inc., 90 P.3d 1020 (Okla. Civ. App. 2004); Edwards v. Basel Pharmaceuticals, 933 P.2d 298, 300 (Okla. 1997).  A manufacturer may be liable for selling or manufacturing a defective product if an unclear or inadequate warning fails to inform a user of an inherent or latent defect.  Smith v. United States Gypsum Co., 612 P.2d 251, 253-54 (Okla. 1980).  However, if the manufacturer provides a warning that covers all foreseeable uses and the product would be safe if the directions were followed, a product is not defective under a failure to warn theory.  Id. at 253.  A manufacturer has no duty to warn users of an obvious danger or risk which an ordinary user would expect from any foreseeable use of a product.  Daniel v. Ben E. Keith Co., 97 F.3d 1329, 1334 (10th Cir. 1996); Duane v. Oklahoma Gas & Elec. Co., 833 P.2d 284, 286 (10th Cir. 1992).

The automated wash alley had a warning sticker attached to the dryer, and Lavatech states that the warning was placed at eye level.  The warning sticker provides:

**WARNING**

**Bodily injury hazards.**

Machine starts automatically!

Keep any part of your body clear of moving mechanism.

**Bodily injury hazards of death.**

Do not enter loading chute, top of machine or drum without following proper lockout/tagout procedure.

**To prevent serious injury, before verification or servicing:**

• Do not perform unless you are trained and authorized to do so.

• Read machine manual.

• Lock main switch in OFF position.

• Use a safe ladder.

• Do not service under the machine without orange supports in position and locked.

Dkt. # 117, Ex. 16. The warning discusses bodily injury that can be caused by "servicing" equipment, but it does not specifically describe the types of service that may result in injury. Plaintiff claims that the warning was inadequate because it failed to specifically warn the user about the danger of climbing on an energized conveyor to clear a jam. Defendant claims that the warning was adequate and, even if further warnings had been provided, Torres would have disregarded any warnings posted on the machine. Lavatech also argues that automated wash alleys were marketed to professional users, and it could assume that professional users would follow any warning on the machine and follow safe practices to dislodge jams.

The parties debate the adequacy of warnings and training provided by Cintas's supervisors at the Tulsa plant, but this issue is not relevant to the adequacy of Lavatech's warning sticker. The Court must focus on the content of the manufacturer's warning to determine if a product is defective due to an inadequate warning. The Court has reviewed the warning attached to the dryer, and finds that it does not specifically address the hazard causing Torres' death. There is a genuine issue of

material fact as to whether a user of the machine was required to de-energize the equipment before mounting the conveyor to clear a jam.  On the face of the warning sticker, there is no indication that Lavatech intended to warn users about the danger of climbing on the conveyor with the machine energized.  While the warning sticker informs a user to follow lockout/tagout procedures before servicing the machine, the word "service" is general and does not necessarily encompass the conduct engaged in by Torres.

Lavatech also argues that Torres assumed the risk of any danger by climbing on an energized conveyor in violation of the warning sticker and his training.  The Oklahoma Constitution requires that "the defense of contributory negligence or of assumption of the risk shall in all cases whatsoever, be a question of fact, and shall, at all times, be left to the jury."  OKLA. CONST. art. XXIII, § 6.  There is an exception to this rule where "upon undisputed facts, reasonable people exercising fair and impartial judgment could not reasonably reach different conclusions concerning them."  Flanders v. Crane Co., 693 P.2d 602, 606 (Okla. 1984).  This case is not so clear cut that Lavatech is entitled to summary judgment based on its argument that Torres assumed the risk of injury, and this basis for summary judgment is rejected.

**IT IS THEREFORE ORDERED** that Defendant Cintas Corporation's Motion for Summary Judgment (Dkt. ## 106, 109) is **denied**.  Defendant Lavatec, Inc.'s, Motion for Summary Judgment (Dkt. # 116) is **granted in part** and **denied in part**; it is granted as to applicability of the statue of repose, but denied based on inadequacy of the 2001 warning sticker.

**IT IS FURTHER ORDERED** that the magistrate judge's report and recommendation (Dkt. # 113) is **accepted**, and plaintiff's Motion for Leave to File Second Amended Complaint (Dkt. # 102) is **denied**.

**DATED** this 13th day of November, 2009.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT